41 C.C.P.A. (Patents)
### Application of HOLDEN.
### Patent Appeal No. 6018.

United States Court of Customs and Patent Appeals.
March 23, 1954.

C. Willard Hayes, Washington, D. C. (Charles F. Chisholm, P. F. Hilder and Ramsey, Chisholm & Hilder, New York City, of counsel), for appellant.

E. L. Reynolds, Washington, D. C. (S. W. Cochran, Washington, D. C., of counsel), for Commissioner of Patents.

Before O'CONNELL, JOHNSON, WORLEY, COLE and JACKSON, Judges.

COLE, Judge.

The Primary Examiner of the United States Patent Office rejected, for lack of invention over the prior art of record, all of the claims accompanying the appellant's application for a patent for "Salt Bath Furnaces" and the Board of Appeals sustained that finding. This appeal therefrom involves claims 1, 6, 7, 9, and 11 drawn to the apparatus and claims 16, 17, 20, and 21 directed to the process.

Claims 1 and 16 are representative and read:

"1. A salt bath furnace comprising an outer pot adapted to contain a molten salt bath, means for heating the salt bath, a second pot within said outer pot and adapted to be partially immersed in the salt bath in the outer pot, said second pot having a portion thereof exposed to the atmosphere outside of the outer pot and being adapted to contain a working molten salt bath heated by the salt bath within the outer pot,

means for sealing the inner pot, and a fluid conduit heated by the salt bath in the outer pot to a temperature above that of the salt bath within the second pot for passing a gas into the lower portion of the second pot.

"16. The method of nitriding alloy steel comprising immersing the steel in a molten salt bath maintained at elevated temperature, heating ammonia gas to a temperature above the temperature of the salt bath, and introducing the heated ammonia gas into the salt bath while the steel is immersed therein."

The application is worded in clear and understandable language and is accompanied by several important drawings. It is not felt necessary to reproduce them as part of this opinion, however, but we will attempt to describe the same without the use of the numerals thereon. A rear elevation of the furnace is shown in Figure 1 with portions broken away to disclose internal construction. The vertical sectional view of the furnace, Figure 3, is especially helpful and important. Details of construction are emphasized in all the figures.

The following concise statement from the appellant's brief sets forth clearly what the alleged invention involves:

"The invention of the instant application is in the field of the nitriding of steel. Certain steel alloys may be nitrided by causing nitrogen to react with the alloying metals to produce a very hard surface layer.

"One method of nitriding steel parts is by placing them in a molten salt bath containing nitrogen-bearing salts maintained at a temperature of about 1,000° F. and bubbling ammonia gas through the salt bath, the process resulting in reaction of nitrogen with alloying metals in the steel to form a thin, very hard, wear-resistant surface

layer, known as a 'case.' The nitrogen, which is introduced into the bottom of the salt bath by a pipe running downwardly therethrough, is more or less dissociated by the heat of the bath into nascent or atomic (chemically very active) nitrogen and molecular hydrogen which bubbles upwardly through the bath. A considerable portion of the nitrogen is taken up by the bath to replace nitrogen that has gone into the metal alloys, and the hydrogen, undissociated ammonia, and nitrogen unused by the bath, together with other waste gases from the process, such as carbon monoxide issue from the surface of the bath.

"Appellant has found that the process can be improved and the degree of dissociation of ammonia gas increased so as to make a greater portion of the nitrogen available for the nitriding process by use of a novel furnace construction in which the pot containing the nitriding salts is received within an outer pot filled with a salt bath for heating the inner pot and the ammonia gas is introduced into the bottom of the inner pot through a conduit passing downwardly in heat-exchange relation with the salt bath in the outer pot. The top of the inner pot is exposed to the atmosphere to permit loss of heat thereto and, therefore, there will always be a temperature differential between the salt bath of the outer pot and the salt bath of the inner pot, this temperature differential usually amounting to about 50° F. The higher temperature of the outer pot results in a greater dissociation of ammonia gas flowing into the inner pot, and, therefore, a greater amount of nitrogen is available."

In its principal aspects, as may be observed from the foregoing description, the claimed invention relates to a method and apparatus for the nitriding of steel whereby nitridable steel alloys are immersed in a molten salt bath containing a nitrogen compound (a cyanide) for the purpose of forming a layer or "case" on the metal therein under treatment. Ammonia gas, bubbled into the bath under pressure, is dissociated into nascent or atomic nitrogen and molecular hydrogen, the former medium chemically reacting, as indicated, with the surface metal to thus provide the nitrided "case." As will subsequently be developed, the process of dissociating the ammonia gas is of vital importance and forms the essence of the appellant's allegedly inventive disclosure.

The commonly employed range of temperature for carrying out the nitriding process is between 950° and 1000° F. although slightly higher or lower temperatures may be used. While low nitriding temperatures are productive of more hardened layers or "cases," dissociation of the ammonia gas is effectuated to a greater extent at higher temperatures. In this respect, without sacrificing the desired degree of hardness in the "case," the appellant seeks to realize a higher percentage of dissociation of the ammonia gas by preheating such gas to a temperature higher than the temperature of the nitriding bath itself before the gas enters the bath and contacts the metal parts therein.

As previously indicated, the furnace structure devised by the appellant for performing the stated method consists, in brief, of an outer pot containing a molten salt bath which is electrically heated by passing current through said bath between electrodes, and an inner pot, containing the nitriding salts, positioned within the outer pot and extending to the top thereof, is heated from the outer pot. A conduit running downwardly along the outer surface of the inner pot, in heat exchange relation with the molten salt bath in the outer pot, allows for the introduction of the ammonia gas into the bottom of the inner pot. A cover is provided for the inner pot so that the metal parts may be

placed therein or removed therefrom without interrupting furnace operation.

Loss of heat through the upper portion and cover of the inner pot is permitted in setting up the constantly maintained temperature differential between the two pots. As a result thereof, the ammonia gas, prior to entry into the bottom of the inner pot, is preheated during its passage through the conduit to a temperature higher than the temperature within the inner pot. Consequently, the ammonia gas is dissociated to a greater degree and the supply of nascent nitrogen usable in the process is increased. In other words, utilizing the more precise language found in the appellant's brief, the foundation of the disclosure is as follows:

"Ammonia gas is introduced into the inner pot through a conduit running along the outside surface of the inner pot and directly exposed to the salt bath within the outer pot. A temperature differential of up to 50° is maintained at all times between the salt bath of the outer pot and the salt bath of the inner pot, the salt bath within the inner pot always remaining at a substantially lower temperature than the outer pot due to heat losses through the upper portion and cover of the inner pot. Therefore, the ammonia gas immediately before entering the inner pot is preheated to a temperature substantially *higher* than the temperature within the inner pot, thus resulting in a substantially higher percentage of dissociation of ammonia and more efficient use of ammonia in the process." [Italics quoted.]

The appealed claims are all directed to the essential feature of heating the ammonia gas to a temperature higher than the nitriding temperature (in the inner pot) prior to introduction of the same into the bath, and the specific structure by which that method is performed.

The references relied upon by the Board of Appeals and referred to herein are:

Holden 2,395,329 Feb. 19, 1946; Harsch 1,999,757 Apr. 30, 1935; Johnson 2,284,057 May 26, 1942; French patent 701,149 Mar. 12, 1931.

The appellant herein is the patentee listed in the above Holden reference. The claims of the present application were rejected as unpatentable over Holden in view of Harsch. The patent to Johnson and the French patent are of significance only insofar as they teach the use of liquids as a means for heating treating chambers. Thus, the means used by the appellant for heating the cyanide bath (inner pot) is concededly old in the art and, *per se*, not inventive. Johnson also shows a gas pipe heated by an outer bath and leading to an inner chamber. Likewise, this feature of the appellant's device is admittedly conventional.

The patent to Holden, as well as the application of the appellant herein, are both directed to a method of nitriding known in the art as the "wet" process, the parts under treatment being actually immersed in the nitriding salt bath. The Harsch reference, on the other hand, discloses the "dry" method of nitriding whereby the parts to be treated are placed in a "basket" within a chamber and subjected at elevated nitriding temperatures to a gaseous medium, including ammonia gas, which, upon dissociation, directly contacts the metal and the nitrided "case" is thus formed. The ammonia gas in the "dry" method of Harsch acts in the capacity of not only providing the nitrogen for chemical reaction with the metal, but also for the purpose of functioning as a heating medium for heating the steel parts to be treated.

Reduced to its essential holding, the examiner's position was based on the belief that the "wet" nitriding process of the Holden reference and the "dry" nitriding process of the Harsch reference, though specifically different, were

full equivalents producing the same result, and that although the Holden patent does not show preheating of the ammonia gas before it enters the nitriding bath, such teaching is amply and clearly set forth in the teachings of the Harsch patent. The Board of Appeals concurred in this view and commented as follows regarding the preheating feature of the present claims:

" * * * The process and the furnace disclosed therein [the Holden patent] are very similar to the presently claimed process and furnace. The main difference between them resides in the manner in which the ammonia is introduced into the nitriding bath. In the furnace of the patent, the ammonia is introduced into this bath by means of a pipe which does not pass through the heating zone of the furnace. Consequently, the ammonia is not heated to a temperature higher than the nitriding temperature before it is contacted with the metal to be nitrided. On the other hand, in the presently claimed furnace, the pipe through which the ammonia is introduced into the nitriding bath first passes through the heating zone where it is heated above the nitriding temperature. The Examiner holds that this modification of Holden's practice is without patentable merit because it is amply suggested in Harsch, where it is recognized that by passing the ammonia over heating coils, before contacting the same with the metal which is to be nitrided, the ammonia is dissociated to a greater extent and it is therefore 'in a chemically active state before coming in contact with the metal.'

* * * * * *

" * * * in view of the fact that it is well recognized that it is desirable to dissociate the ammonia gas in both the Holden and in the Harsch processes, the clear teaching in Harsch that this dissociation may be enhanced by passing the gas over the heating coils, amply suggests that the process of Holden may be improved by passing the gas through the heating zone of the furnace before introducing the same into the nitriding container. * * * "

The alleged errors specified by the appellant in requesting reversal of the board's decision involve specific questions relating to what the Harsch patent discloses; whether the processes of Harsch and Holden are substantially equivalent; whether Holden in view of Harsch thereby anticipates the method claims; and whether the structure set forth in Holden, in view of the Harsch, Johnson, and French patents anticipate the apparatus claims of the application.

Dealing first with the disclosure of the Harsch reference, which played such an important part in the rejection of the appellant's claims, that inventor provides an insulated chamber wherein a "basket" is contained for the metal to be nitrided as well as electrical resistance heating units which are located about the periphery of said chamber. Ammonia gas is supplied to the nitriding chamber by a pipe, the gas thereafter being driven by a fan which thus circulates the gas between the heating elements and the metal in the "basket." The appellant has strenuously contended that the incoming ammonia gas in Harsch is not heated to a temperature above the nitriding temperature before contacting the metal parts in the "basket." On the contrary, the appellant argues, the gas is admitted cold. In support of this conclusion, the appellant maintains that the gas pipe is not located adjacent to the heating elements though it would have been just as easy to so provide had Harsch actually been cognizant of the concept of preheating the entering gas as shown by appellant in the instant application. In this respect, the appellant states that the concentrated ammonia gas is not directed against the heating units in the chamber.

In answer to the foregoing contentions, we quote, as follows, from the patent to Harsch:

"* * * a reactive gas or vapor, as ammonia for nitriding, is circulated into heat transfer relation with a source of heat where it is dissociated to a greater or less extent and utilized as a heat vehicle; and more particularly the aforesaid gas or vapor in its wholly or partially dissociated state is subsequently passed into direct contact with the metal for case-forming reaction therewith concurrent with absorption of heat by said metal from the reacting gas or vapor.

\* \* \* \* \* \*

"* * * The fresh ammonia gas is * * * caused to flow downwardly either through the treating chamber or the heating chamber, depending on the direction of rotation of the fan, and to circulate between the source of heat and metal. *As the gas flows past the highly heated electrical resistors, it is dissociated to a greater or less extent by the heat absorbed from the resistors*, and accordingly is adapted to react with the metal under treatment when the same has been heated sufficiently by the heat-carrying gas to maintain the desired chemical action. As the ammonia gas, which comprises the heat vehicle, brings the metal up to the desired temperature, further dissociation of the ammonia occurs during its contact with the heated metal. However, *since the source of heat, namely the resistors, is at a higher temperature than that of the metal under treatment, it will be apparent that dissociation of the ammonia occurs to a greater extent when it is passed into heat-transfer relation with the source, and so is in a chemically active state before coming into contact with the metal*." [Italics ours.]

Circulation of the ammonia gas between the heating units and the metal is clearly disclosed and, as stated by the Solicitor for the Patent Office, "During any cycle in the circulation, obviously the gas has been treated by the heaters before contacting the metal." That the entering gas is brought to a temperature higher than the nitriding temperature by the heating elements is likewise clear. To otherwise conclude would be tantamount to ignoring the actual disclosure of the Harsch patent. We believe that the Harsch reference is saturated with that concept which evidently inspired the claims to the process of the appellant herein.

Considering now the question of equivalency between the "wet" and "dry" nitriding processes of the Holden and Harsch patents, it must be conceded that there are differences as set forth, *supra*. There can be no dispute, however, that the essential purpose and accomplishment of each process is the formation of a nitrided "case" by reaction of nascent nitrogen with metal surfaces upon dissociation of ammonia gas. When considered in the light of such similarity of objective and result, the specific differences in the means employed to carry out the respective methods are reduced in significance. Since Harsch clearly discloses enhancing dissociation of ammonia gas by employing temperatures higher than those prevailing in the nitriding zone prior to contact of the gas with the metal, it is our view that Harsch teaches to one qualified in the art such improvement over Holden. In other words, there is a sufficient degree of similarity existing between the two processes which would suggest adapting one process to the other, such modification, as here evident, being well within the expected skill of the worker in the art. The basis for such an assumption is seemingly all the more reasonable when the suggestions contained in the Harsch disclosure are associated with the appellant herein, he holding one of the basic patents of record, and thorough acquaintance with the state of the art with which we are dealing and most, if not all, of its many ramifications should be readily attributed to him.

In arguing the merits of the rejection of the method claims on appeal, the appellant made reference to the fact that Harsch does not show a salt bath and it was concluded thereby that the reference does not show heating the gas to a temperature higher than that of said bath. It is, of course, conceded that the Holden reference does not show this concept of preheating. However, we are in entire agreement with the solicitor's statement that "Harsch does suggest the desirability of heating the gas prior to conducting it to the medium in the nitriding zone and this suggestion would seem to have application whether or not the treating medium is a salt bath."

In the light of our conclusions thus far, it remains necessary only to discuss the appellant's apparatus claims which were rejected primarily on Holden in view of Harsch, the pertinency of the Johnson and French patents of record, *supra*, being admitted. Reviewing to the necessary extent the Holden apparatus, the parts to be treated are placed in a "basket" in the salt bath within a pot. Ammonia gas enters by a pipe leading to the bottom of the salt bath in the pot. Gas burners or the like provide the requisite heating for the bath, such burners being located in a space between the heating pot and an outer container.

The Solicitor for the Patent Office, in his able brief, stated as follows with respect to the apparatus claims on appeal: (omitting reference numerals.)

"* * * Appellant places particular emphasis on the alleged failure of the art to suggest either (1) the provision of inner and outer salt bath pots, a portion of the inner container being exposed to the atmosphere to cause a temperature difference in the baths and (2) a gas conduit in heat exchange relation with the outer bath.

"However, the appellant's specification will not sustain the view that the use of an outer salt bath is a critical feature, in view of the state-ment [in appellant's specification] that:

" * * * the inner pot may be heated by other means than a salt bath, such as a molten metal or *hot combustion gases*." [Italics quoted.]

"The latter suggestion obviously is in substantial conformance with the Holden patent showing of burners discharging hot gases into the heat chamber. Moreover, the appellant admits the conventionality of the claimed heating arrangement particularly as shown in the French patent.

"The decisive issue, therefore, is reduced to whether the alteration of Holden to place the [gas delivery] pipe in heat exchange relation with the space [between Holden's containers] would require invention. Harsch suggests that it would be advantageous to apply heat to the incoming gas.

"Although the appellant is correct in urging that Harsch does not heat a gas *pipe*, that expedient is commonly employed in many arts. The claimed relocation of the Holden pipe is believed to be such as to suggest itself as the most obvious way of incorporating the Harsch suggestion in the Holden apparatus." [Italics quoted.]

We have considered the appellant's contentions in relation to the claimed apparatus but believe that the position taken by the solicitor in support of the board's conclusion that the apparatus in question does not patentably distinguish over the prior art is manifestly correct and seemingly not answerable.

For the reasons hereinbefore stated, the decision of the Board of Appeals is affirmed.

Affirmed.

JACKSON, J., retired, recalled to participate herein in place of GARRETT, C. J.